UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

```
                                :
LAURA MURRAY,                   :
     Plaintiff,                 :
                                :
          v.                    :    No. 2:07-cv-115
                                :
INTERNATIONAL BUSINESS          :
MACHINES CORPORATIONS,          :
     Defendant.                 :
```

## OPINION AND ORDER

Plaintiff Laura Murray challenges Defendant International Business Machines Corporation's ("IBM") final decision to deny insurance benefit coverage for bilateral reduction mammoplasties and thighplasties.  Plaintiff's action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A § 1001 et seq.  Before the Court are Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion for Summary Judgment.  For the reasons set forth below, Plaintiff's motion is DENIED and Defendant's motion is GRANTED.

## I. BACKGROUND

The following facts are undisputed.  Murray is an IBM employee.  As an IBM employee, Murray receives health care benefits through IBM's self-insured plan, the IBM Medical and Dental Plan ("the Plan").  (AR 93.)  During the time period relevant to this action, MVP Select Care, Inc. ("MVP") administered the Plan in Vermont.  (AR 78.)

1

In April 2003, Murray underwent gastric bypass surgery, which was covered by the Plan.  (AR 63.)  She lost over 200 pounds and as a result of the substantial weight loss, she was left with significant amounts of excess skin on her arms, abdomen, breasts, and thighs.  (AR 34.)  Plaintiff developed intertrigo (rashes or irritation caused by chafing of the skin) on the areas where the excess skin rubbed against itself.  (AR 33.)  On April 7, 2005, Murray underwent surgeries to remove the excess skin on her arms and abdomen.  (AR 31.)  MVP initially denied coverage for these surgeries but overturned the denial because of "functional impairment and recurrent intertrigo."  (AR 72.)

After these surgeries, Murray's plastic surgeon requested approval for bilateral reduction mammoplasties and bilateral thighplasties.  (AR 63.)  An MVP medical director reviewed the claim, and on October 6, 2005, MVP sent Murray a letter denying coverage because there was no "evidence of conservative treatments or exercise regimen failure."  (AR 16.)  On December 12, 2005, Murray appealed the denial.  She argued that the procedures were medically necessary and included supporting letters from three physicians. (AR 26, 27, 28.)  None of these letters mentioned conservative treatments.  Dr. William Bremer, an MVP Medical Director, reviewed Murray's claim and found that there was a lack of "documentation of a failed, adequately

supervised trial of conservative measures" and that neither the

thighplasties nor mammoplasties were medically necessary.

(AR 18.)

The Plan defines "medically necessary" as follows:

> Except where state law or regulation requires
> a different definition, "Medically Necessary"
> or "Medical Necessity" shall mean those
> health care services rendered in accordance
> with generally accepted standards of practice
> in the medical or dental professions that
> are:
>
> - Required to diagnose or treat an
>   illness, injury, disease or its symptoms
> - Considered effective for the patient's
>   medical condition, illness, injury or
>   disease
> - Clinically appropriate, in terms of
>   type, frequency, site and duration
> - Not primarily for the convenience of the
>   patient, patient's family or Healthcare
>   Provider, a Physician or an other
>   Healthcare provider
> - Rendered in the least intensive setting
>   that is appropriate for the safe
>   delivery of the services and supplies
> - Rendered in the most efficient and
>   economical way; not more costly than an
>   alternative service or sequence or
>   services which would produce equivalent
>   therapeutic or diagnostic results
>   beneficial to the diagnosis or treatment
>   of the covered person's illness, injury
>   or disease
> - Based on credible scientifically based
>   guidelines of national medical, research
>   or governmental agencies

(Def.'s Facts Ex. 1 at 47.)

On January 3, 2006, MVP sent Murray a letter stating that it was upholding its initial denial based on Dr. Bremer's findings. (AR 18.)

On December 29, 2006, Murray initiated the final appeal to the IBM Plan Administrator, Rosemarie Barnes. (AR 53.)   In her appeal, Murray included physicians' letters and medical records indicating that she had tried conservative treatments.  (AR 103, 105, 111, 112, 114, 127.)   Of the medical records submitted, the dermatologist's report, dated February 22, 2005, contained a prescription for topical creams. (AR 103.) The remaining letters and medical records contained statements that conservative treatments provided only temporary relief. (AR 105, 111, 112, 114, 127.)

Barnes sent the record to IPRO, an independent medical review firm.  (AR 61.)  At IPRO, a physician, board certified in plastic surgery, reviewed the claim.  The IPRO physician determined that the procedures were not medically necessary under the guidelines set forth by the American Society of Plastic Surgeons ("ASPS").  (AR 62.)  The guidelines set forth by the ASPS in its position paper, "Treatment of Skin Redundancy Following Massive Weight Loss," state: "Resection of redundant skin and fat folds is medically indicated if panniculitis . . . or uncontrollable intertrigo . . . is present." (AR 2.)  Upon review of Murray's records, the IPRO physician found that the

4

records did not document "the failure of medically supervised
conservative therapy to control [Murray's] intertrigo."
(AR 65.)  The IPRO physician concluded that in Murray's case
"[b]ody contouring is not a medically necessary procedure in the
absence of documentation that confirms the failure of medically
supervised conservative treatment . . . .  Body contouring is
desirable for aesthetic reasons, but it is not medically
necessary."  *Id*.  Based on the two previous reviews by MVP
medical directors and the IPRO physician's review, Barnes denied
Murray's appeal.  Murray was notified by letter dated March 1,
2007 that her appeal had been denied.  (AR 20.)

## II. Standards of Law

### A. Legal Standard for Summary Judgment

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate
if the offered evidence shows no genuine issue of material fact
and the moving party is entitled to judgment as a matter of law.
The burden is on the moving party to demonstrate the absence of a
genuine issue of material fact, and in considering the motion,
the Court must resolve all ambiguities and draw all inferences in
favor of the nonmoving party.  *Ocean Ships, Inc. v. Stiles*, 315
F.3d 111, 117 (2d Cir.2002) (citing *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 255 (1986)).  Where both parties have moved
for summary judgment, "the court must evaluate each party's
motion on its own merits, taking care in each instance to draw

all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Bd. of Educ. of City School Dist. of City of Olean*, 667 F.2d 305, 314 (2d Cir. 1981).

**B. Legal Standard for Review of Denial of Benefits under ERISA**

The parties agree that the "arbitrary and capricious" standard of review applies to the Court's review of IBM's decision to deny Murray's claim for benefits under the Plan. The Plan grants the Administrator "exclusive authority and discretion to interpret the terms of the benefits described [therein]." (Def.'s Facts ¶ 3, Ex. 1 at 2.) "[W]here the written plan documents confer upon the plan administrator the discretionary authority to determine eligibility, we will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995). The arbitrary and capricious standard of review is highly deferential to the plan administrator's determination, and the Court "may overturn a decision to deny benefits only if it was 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Id.* at 442 (quoting *Abnathya v. Hoffman-La Roche, Inc.,* 2 F.3d 40, 45 (3d Cir. 1993)).

Furthermore, the Court generally will not look to evidence outside the Administrative Record upon review of a plan administrator's decision. "[A] district court's review under the arbitrary and capricious standard is limited to the

administrative record." *Miller v. United Welfare Fund*, 72 F.3d
1066, 1071 (2d Cir. 1995); *accord Zervos v. Verizon New York,
Inc.*, 277 F.3d 635, 647 (2d Cir. 2002) ("[W]e limit our review of
[the plan administrator's] decision to the administrative
record.").

### III. Discussion

The Court finds Murray's argument that IBM's decision was
arbitrary and capricious unsupported by the facts in the file.
Murray argues that IBM's decision was arbitrary and capricious
for three primary reasons.  First, she argues that IBM's decision
was unreasonable because it was inconsistent with its previous
decision to provide coverage for the first set of surgeries.
Murray claims that IBM applied a higher standard to the second
approval request, even though, as she claims, the "merits for the
second surgeries [were] the same for the primary surgery."
(Pl.'s Reply Mem. in Supp. of Mot. for Summ. J. 14.)  IBM asserts
that evaluating the medical necessity of each set of surgeries
separately was reasonable and proper in light of the accepted
medical standards.  (Def.'s Mem. of Law in Supp. of Cross Mot.
for Summ. J. & Opp'n To Pl.'s Mot. for Summ. J. 6, 16.)

The file reveals substantial evidence to support IBM's
determination that the second set of surgeries did not amount to
an inconsistent application of the Plan.  Under the criteria set
forth by the ASPS, surgery to remove excess skin is medically

necessary if there are "specific signs and symptoms that 1) are clearly related to the excess skin[;] 2) are health threatening or cause significant functional disability[;] and 3) have failed to improve despite reasonable attempts at conservative therapy." (AR 62.)   Under the ASPS guidelines, symptoms indicating medical necessity may be present in one part of the body but not in another.  (AR 2.)  Given the accepted medical standards, IBM's decision that the first set of surgeries was medically necessary but that the second set of surgeries was not does not constitute an inconsistent application of the plan, and therefore is not unreasonable.

Second, Murray argues that the Administrator's decision to deny benefits was unsupported by substantial evidence because the Administrator relied on the opinion of the IPRO physician rather than the opinions of Murray's treating physicians.  However, "a plan need not accord the insured's treating physician greater deference than a plan's retained physician.  Although plan administrators may not 'arbitrarily refuse' to credit the reliable evidence put forth by a claimant, there is no 'heightened burden of explanation . . . when they reject a treating physician's opinion.'" *Demirovic v. Bldg. Serv. 32 B-J Pension Fund*, 467 F.3d 208, 212 (2d Cir. 2006) (citing and quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831, 834 (2003)).

Here, the file reveals that IBM's decision to deny coverage was supported by substantial evidence.  "Substantial evidence . . . 'is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] . . . requires more than a scintilla but less than a preponderance.'"  *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) (quoting *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (2d Cir. 1992).  The physicians' letters written in support of Murray's claim contained only conclusory statements that conservative treatments merely provided Murray temporary relief; they did not document a "failed adequate supervised trial of conservative treatments."  In contrast, the two MVP medical directors and the IPRO physician evaluated Murray's claim under the accepted medical standards, after reviewing all materials submitted by Murray.  The three opinions of IBM's reviewing physicians, when considered alongside the inadequate medical documentation presented by Murray's physicians, provide "more than a scintilla of evidence" such that a reasonable mind might accept IBM's decision.

Finally, Murray argues that IBM's decision was arbitrary and capricious because it was erroneous as a matter of law.  Murray asserts that IBM's decision was erroneous as a matter of law because (1) IBM interpreted the Plan in a manner inconsistent with its plain words; (2) IBM employed the wrong definition of

medical necessity; (3) IBM failed to conduct an individual assessment of Plaintiff's claim; and (4) IBM failed to properly notify Plaintiff of the reasons for the denial of benefits.

As for the first argument, Murray cited an IBM position statement which provides that a failure of conservative treatments is no longer a basis for denying coverage of outpatient procedures, such as those Murray requested.  However, as discussed above, under the accepted medical standards, failure of conservative treatments is a prerequisite for a finding that the requested procedures are medically necessary.  Thus, IBM's denial of coverage based on a lack of documentation of a failure of conservative treatments is not inconsistent with the Plan's plain words; rather, the specific guidelines for reconstructive surgery following gastric bypass surgery make clear that a failure of conservative treatments is a prerequisite for a finding that the requested procedures are medically necessary.

Second, Murray argues that IBM employed the wrong definition of "medically necessary" because Vermont Department of Banking, Insurance, Securities and Health Care Administration ("BISHCA") Rule 10.103(BB) supersedes the Plan's definition of "medically necessary," and in the alternative that the "IBM EPO-HealthPartners Summary Plan Description," not the IBM Summary Plan Description ("SPD"), provides the correct definition of medical necessary because she participated in the IBM Exclusive

Provider Organization ("EPO").  Murray argues that under either
of these definitions of medically necessary, her claim would have
been approved.  Both of these definitions require that medically
necessary care meet generally accepted medical standards.  *See*
BISHCA Rule 10.103(BB) ("Medically-necessary care must be
consistent with generally accepted practice parameters as
recognized by health care providers in the same or similar
general specialty as typically treat or manage the diagnosis or
condition."); Pl.'s Reply Mem. in Supp. of Mot. for Summ. J. Ex.
A (IBM EPO-Healthpartners Summary of Benefits) at 16 ("Medically
necessary care must meet . . . clinically accepted medical
services and practice parameters of the general medical
community.").  As discussed above, the file reveals substantial
evidence to support IBM's determination that under the accepted
medical standards Murray had not made the requisite showing of
medical necessity.  Given that the definitions of medically
necessary set forth by BISHCA and the IBM-EPO Healthpartners SPD
contain the same requirement as the Plan's definition—that
medically necessary care must accord with generally accepted
medical standards—IBM's decision to deny coverage is not
arbitrary and capricious under any of the definitions.

Third, Murray argues that IBM failed to make an individual
assessment of her claim because the Administrator never contacted
Murray's physicians and the independent medical reviewer never

examined Murray.  Murray cites no case law for the proposition
that an individual assessment requires the administrator to
contact the insured's treating physicians or have the
administrator's independent medical reviewers examine the
insured.  The file reveals that IBM gave Murray's claim a
thorough review and made an individual assessment.  The MVP
medical directors and the IPRO physician considered all of the
materials submitted by Murray.  After reviewing the entire file
herself, and submitting the file to an independent medical
reviewer, the Administrator determined that Murray had not shown
that the requested procedures were medically necessary.  There is
no support for Murray's claim that, in this case, an individual
assessment requires anything beyond a thorough review of the
materials submitted.

Finally, Murray argues that IBM's decision was erroneous as
a matter of law because IBM failed to properly notify Murray of
the reasons for denying her claim in the October 6, 2005 and
January 3, 2006 denial notices.  Murray claims that the denial
letters did not provide her with a clear understanding of what
documentation was required to perfect her claim, and that had she
been properly notified she would have been able to successfully
appeal the denial.

Under ERISA, an initial notification of benefit
determination must include in pertinent part: "(i) The specific

reason or reasons for adverse determination; (ii) Reference to the specific plan provisions on which the determination is based; [and] (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503-1(g).  Notification of a benefit determination on review must include in pertinent part: "(1) The specific reason or reasons for the adverse determination; (2) Reference to the specific plan provisions on which the benefit determination is based; [and] (3) A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503-1(j).  The Second Circuit has stated, "[t]here are at least two reasons for the [notice] requirement. First, notice can provide the member with information necessary for him or her to know what he or she must do to obtain the benefit.  Second, if the [plan administrator] persists in its denial, notice can enable the member effectively to protest that decision."  *Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 287 (2d Cir. 2000).

Murray's claim is not born out by the facts.  The October 6, 2005 initial denial notice described the specific reason for denial: "no evidence of conservative treatments or exercise

regimen failure." The notice also instructed Murray to provide
additional information to dispute the basis of the decision and
invited Murray to have her physicians contact the MVP medical
director to discuss her claim. This letter clearly meets the
notice requirements of 29 C.F.R. § 2560.503-1(g).

The January 3, 2006 notice also specifically stated the
reason for denial: "no documentation of a failed adequate
supervised trial of conservative measures." This language
provides a clear statement of the specific reason for denial,
which is sufficient to meet the requirements of 29 C.F.R. §
2560.503-1(j)(1). Furthermore, comparing the full text of the
notice to the text of 29 C.F.R. § 2560.503-1(j) reveals that the
notice conforms almost precisely to the additional requirements
of the notice regulation.

Murray claims that she was not put on notice of the specific
reasons for the denial of her claim until she received the March
1, 2007 letter. However, the October 6, 2005 letter clearly
identified "no evidence of conservative treatments" as the reason
IBM would not provide coverage, and explicitly stated that Murray
could submit additional information to challenge the denial.
Murray submitted additional information pertaining to her
functional impairment, but omitted information regarding
conservative treatments. In response to the January 3, 2006
notice, Murray submitted records addressing the fact that she had

14

tried some conservative treatments to treat her intertrigo to no avail.  The submission of these records indicates that Murray was adequately notified of the reason for the denial. Thus, it is clear that after this second denial letter, Murray had been sufficiently apprised of the reasons for the denial of her claim.

## IV. Conclusion

The Court expresses no opinion as to whether the requested procedures are, or are not, medically necessary at this time. Rather, the Court finds that the file, as it stands at this time, reveals that IBM's decision to deny Murray's claim on the grounds that Murray had not made the requisite showing of medical necessity was rational and supported by substantial evidence.

For the foregoing reasons, the Court DENIES Plaintiff's Motion for Summary Judgment and GRANTS Defendant's Cross-Motion for Summary Judgment.


Dated at Burlington, Vermont this 26th day of March, 2008.


/s/ William K. Sessions III
William K. Sessions III
Chief Judge